REYNOLDS METALS COMPANY, a
corporation, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 15646.

United States Court of Appeals
District of Columbia Circuit.

Argued March 12, 1962.

Decided Sept. 27, 1962.

**224**

Mr. Kahl K. Spriggs, Washington, D. C., with whom Messrs. Woodson P. Houghton, Washington, D. C., and Gustav B. Margraf, Richmond, Va., were on the brief, for petitioner. Mr. John F. Myers, Washington, D. C., also entered an appearance for petitioner.

Mr. Frederick H. Mayer, Atty., Federal Trade Commission, with whom Messrs. James McI. Henderson, General Counsel, and William F. Upshaw, Atty., Federal Trade Commission, were on the brief, for respondent. Mr. Alan B. Hobbes, Asst. Gen. Counsel at the time the record was filed, and Mr. Francis C. Mayer, Atty., Federal Trade Commission, also entered appearances for respondent.

Before WILBUR K. MILLER, Chief Judge, and DANAHER and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Reynolds Metals Company (Reynolds) seeks to review and set aside a final order of the Federal Trade Commission in a proceeding instituted by the Commission in which Reynolds was charged with a violation of Section 7 of the Clayton Act, 38 Stat. 731 (1914), as amended, 64 Stat. 1125 (1950), 15 U.S.C.A. § 18. The Commission's precise determination was that Reynolds' 1956 acquisition of the stock and assets of Arrow Brands, Incorporated (Arrow), a company then engaged in converting aluminum foil and selling it nationally to wholesale florist supply houses, violated Sec. 7. The challenged acquisition, in the Commission's language, "may have the effect of substantially lessening competition or tending to create a monopoly in the production and sale of decorative aluminum foil to the florist trade." Divestiture of certain stock and assets of Arrow Brands and of a building built and owned by Reynolds for Arrow's use was also ordered. Reynolds' motion to reopen the case for additional evidence, for rehearing and to modify the divestiture order was denied by the Commission in March 1960.

It is urged on appeal that the Commission erred in its conclusion that the "production and sale of decorative aluminum foil *to the florist trade*" is the "relevant line of commerce" within the meaning of Sec. 7 of the Clayton Act; secondly, that the Commission erred in concluding that Reynolds' acquisition of Arrow violated Sec. 7; third, that the Commission's divestiture order should have been modified; and last, that the Commission should have reopened the cause for additional evidence.

Aluminum foil is the term employed to describe an alloyed form of sheet "wrapping" aluminum which has been passed repeatedly through thinning rollers functioning to reduce the sheets to thicknesses below .006 of an inch. At this gauge and thinner the foil is "dead" soft, 0 temper, oil free, yet approximately 99.5% pure aluminum, and may be used for many different purposes. The basic commodity is widely sold in gro-

cery stores, supermarkets and variety stores and used for an almost infinite number of household purposes. The foil may be molded, crimped and formed easily, and may be colored, lacquered, embossed, printed or laminated. This case is concerned chiefly with foil decorated in certain of these ways for use by the nation's approximately 700 wholesale florist outlets and 25,000 retail florists.

Reynolds is the largest producer of aluminum foil in the world.[1] In 1957 its production capacity of 117 million pounds per year formed 40.5% of the total foil production capacity of all ten foil producers in the United States. The record indicates that the large foil producers such as Reynolds find it both impracticable and unprofitable to accept small orders from small buyers of foil to be used for specific and limited end purposes such as the decoration of flower pots or foodstuffs. Consequently, Reynolds and other major raw foil producers sell in quantity to intermediaries known in the trade as converters, who have come into existence precisely to meet the needs of these small foil markets, which individually do not require a sufficiently large amount of raw foil to purchase it in the minimum quantities sold by the manufacturers. These converters purchase large quantities of foil from the producers in so-called "jumbo" rolls, and after breaking these down and processing them with decorative or other features sought by the end users, sell in limited quantities to the several smaller markets.

Arrow, prior to and since its acquisition by Reynolds in 1956, has been engaged in converting "jumbo" rolls of raw foil into such limited quantities of a specialized kind which are then sold, in decorated form, almost exclusively to the florist trade. While roughly 200 foil converters are active in the United States, only eight (approximately)[2] including Arrow, served the florist industry when this proceeding began.[3] In 1956, these eight firms sold not more than an estimated 1,500,000 pounds[4] of florist foil altogether, of which Arrow accounted for approximately 33%. Several of the firms competing with Arrow in converting foil for the florist industry purchased their plain or raw foil from Reynolds prior to the acquisition. Raw foil costs to an unintegrated florist foil converter, such as Arrow was, account for 70% of the total cost of production.

The remainder of the 200 converters process aluminum foil for all its many other uses, including usage as tape, candy box liners, covers for take-out foodstuffs, condensers and many others. The uses are almost endless. The government concedes that theoretically all 200 converters could supply florist foil, but observes that in fact only the eight firms comprise the domestic *florist* foil converting industry. The record supports this view and we must assume for this discussion that the florist trade is supplied almost exclusively by the eight firms listed. We will return to the significance of this fact in relation to whether converting foil for the florist trade is a relevant line of commerce in any section of the country within the context of Sec. 7.

Section 7 in pertinent part reads:

"No corporation engaged in commerce shall acquire * * * the

1. Reynolds in 1957 led the Aluminum Company of America by 37 million pounds in capacity for foil production. Kaiser Aluminum and Chemical Corporation was third. In 1957 Reynolds had net sales of 446.5 million dollars, net income of 37.8 million dollars and total assets valued at 733.2 million dollars.

2. The Commission found "eight or ten" firms.

3. The others were Highland Supply Corporation, Highland, Illinois; H. Jacobson & Co., Worcester, Mass.; H. D. Catty Corporation, Huntley, Illinois, and Norwalk, Connecticut; M. H. Levine Corporation, New York City; John T. Raisin Corporation, San Francisco, California; Western Foil Converters, Berkeley, California; and Lion Ribbon Company, New York City.

4. A limited but undefined quantity of foreign foil appears to have formed a portion of this 1,500,000 pounds.

whole or any part of the stock * * and no corporation subject to * * the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 64 Stat. 1125 (1950), 15 U.S.C.A. § 18.

The problem of market definition in the present case centers only on the determination of the "line of commerce," since Reynolds does not disagree with the Commission's finding that the geographical area for measuring the competitive effects of this acquisition is the entire United States.

■■■ In United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957), the Supreme Court stated that the "determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition' ", citing Standard Oil of California v. United States, 337 U.S. 293, 299, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371. "[T]he problem of defining a market turns on discovering patterns of trade which are followed in practice." United States v. United Shoe Machinery, 110 F.Supp. 295, 303 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S. Ct. 699, 98 L.Ed. 910 (1954). Until recently the established test for finding "patterns of trade" lay with measuring (1) the interchangeability of products from other markets with those in the market which the government was seeking to define and limit, and (2) the cross-elasticity of demand between the product itself and substitutes for it. "Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one com-

modity for another." United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 393, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956).

"The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." Id. at 404, 76 S.Ct. at 1012.

However, in the very recent case, Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the concepts of interchangeability of use and cross-elasticity of demand underwent certain important qualifications and development. It is now clear that mere potential interchangeability or cross-elasticity may be insufficient to mark the legally pertinent limits of a "relevant line of commerce." The "outer limits" of a general market may be thus determined, but sharply distinct submarkets can exist within these outer limits which may henceforth be the focal point of administrative and judicial inquiry under Section 7.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within the broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. * * * The boundaries of such a submarket may be determined by examining such practical indicia as *industry or public recognition of the submarket as a separate economic entity*, the product's peculiar characteristics and uses, unique production facilities, *distinct customers, distinct prices,* sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. at 325, 82

S.Ct. at 1523, 1524.[5] (Emphasis added). (Footnote omitted)

Analyzing the facts of the present case makes it abundantly clear that under these standards the production and sale of florist foil may rationally be defined by the Commission as comprising the relevant line of commerce in terms of (1) public and industrial recognition of it as a separate economic entity, (2) its distinct customers and (3) its distinct prices. Contrary to the Commission's assertion, the evidence is not convincing in the matters of peculiar characteristics and use. However, the former elements disclosed by the record are sufficient to support the Commission's determination that the florist foil market may be legitimately separated from aluminum foil markets generally and thus may be appropriately viewed as the area in which the activity allegedly prohibited by Sec. 7 occurred. In light of the fluidity of the law in this antitrust area, it may be useful to set forth the factual basis on which we hold the Commission was rationally entitled to find that florist foil forms a relevant market or line of commerce and for our disagreement in part with the Commission as to other matters.

The record indicates that total annual United States shipments of aluminum foil of all thicknesses below .006 inches averaged close to 200 million pounds in 1956 and 1957, approximately 75% of which was utilized in some form of packaging or wrapping. However, not all foil used for packaging or wrapping is suitable for the particular use which any given market may require. Suitability for use in particular markets is determined first by thickness. While all sheet aluminum below .006 inches is considered foil, the variety of thicknesses employed below that is large and ranges all the way down to .00065 of an inch, which is considered the thinnest sheet which may be practicably and inexpensively produced with the necessary physical characteristics of strength and tear resistance. Between the extremes of .006 and .00065 inches, uses may and do vary in hundreds of ways, from the packaging of dairy products, meat, tobacco and milling products to the decoration of flower pots and ordinary household use.

Reynolds itself has subdivided its packaging sales division for foil into seven marketing groups, each designed to supply foil for different end uses such as the wrapping and packaging of soap, drugs, dairy products, tobacco, textiles and many others. One subdivision is devoted to supplying foil to converters such as Arrow, whose business is largely confined to the purchase of the giant or "jumbo" rolls from Reynolds at .00065 gauge. As noted, the converter's service to its customers consists of reducing the large economy or "jumbo" lots to lesser quantities purchasable by limited markets such as the florist industry, and decorating these smaller quantities by one of the several coloring or embossing techniques.

It is important to note at this point that *decorative* foil appears as a distinct category in overall aluminum foil production. Of the 192,000,000 pounds of domestic converted aluminum foil shipped in 1956, approximately 9.7 million pounds was composed of decorative foil of all kinds. While the record affords us no precise definition of decorative foil, it does reflect that of the 9.7 million pounds, less than 1½ million pounds were shipped to florist outlets by the eight firms including Arrow which supply that particular trade. Florist foil is undoubtedly one type of decorative foil. The record also affords little affirmative basis for assuming any marked difference between the characteristics of the 1½ million pounds of florist foil and the remainder of the 9.7 million pounds of

5. This limitation upon the conclusiveness of mere interchangeability in measuring markets comports logically with the warning that "There can be a substantial lessening of competition with respect to a product whether or not there are reasonably interchangeable substitutes." United States v. Bethlehem Steel Corp., 168 F. Supp. 576 at 593, note 36.

decorative foil, particularly in view of the variations and tolerances allowed as to weight. All decorative foil, including florist foil, appears to be gauged at approximately the same thickness, .00065 inches. Reynolds further argues that the decorative characteristics of foil sent to the florists is not distinguishable otherwise from foil decorated by similar coloring, laminating or embossing but used, *inter alia,* as cheese wrap, coffee cup covers, suppository wrap, potato wrap and meat interleaving.

The Commission has not overcome these contentions but rather directs the focus on other factors. The Commission points to the evidence that the florist foil converting industry is a relevant line of commerce arising out of the fact that intracompany communications reflect Reynolds' belief in the "specialty nature" of florist foil. Reference is made to letters by Reynolds officials on which the "special needs of the particular trade" are noted, without more, and where statements are found that "This is a specialty business * * * dependent upon the creation of attractively designed colored and embossed foil." The Commission seeks additionally to distinguish florist foil by what is termed its unique "combination of physical and artistic qualities." "The physical attributes stem from the fact that it [florist foil] is made from aluminum foil. The artistic qualities derive from the fact that it is designed for a particular artistic and esthetic purpose; namely, to serve as an attractive and decorative wrap to cover rather ugly flower pots, and yet play a secondary role to the subtly hued and beautiful flower it encloses." But these factors, standing alone, provide no reason for distinguishing florist foil from other decorative foil, all of which is aluminum foil; they are reminiscent of assertions in a complaint, awaiting the proof of a hearing. Florist foil is not unique for purposes of Section 7 simply because someone in an unrelated context said it is a "specialty." Secondly, nothing suggests that the effort to suppress a product's ugly aspects while simultaneously enhancing its intrinsic loveliness, such as that possessed by flowers, is an undertaking peculiar to the flower industry. We may note for example the universal commercial quest to render merchandise attractive by the packaging; some stronger reason must be offered than is offered here for saying that the sublimation of unattractive qualities in a flower arrangement is somehow different from the elimination of such qualities from the presentation of canned goods, potatoes, coffee or raw meat on a supermarket counter, where decorative foil is often and prominently used. Such differentiating reasons may well exist. We are simply not apprised of them by a record which indicates that 9.7 million pounds of decorative foil, including the 1½ million pounds sold to the florists, is evidently all of the same .00065 approximate gauge; evidently colored and embossed in much the same fashion, and evidently all regular commercial purity foil, annealed, dead soft and dry.

Consequently, on the basis of the *use and quality* of the products displayed on the record, we would have difficulty in affirming the Commission's determination that the florist foil converting industry is a line of commerce distinctly separable from the considerably larger decorative foil industry viewed in the aggregate. Nevertheless we must affirm the Commission on the earlier mentioned bases of (1) distinct pricing and purchaser identity, and (2) indisputable industry and consumer recognition of the florist foil converting industry as a separate economic entity.

First, the identity of purchasers of florist foil is distinct and limited. With insignificant exception, the sole purchasers of florist foil are the nation's 700 wholesale florist outlets and, through these, the 25,000 retail florists throughout the country. Despite a clearly lower price for florist foil, discussed *infra,* other end users of decorative foil have not joined the identifiable mass of florist foil purchasers in noticeable numbers. As already noted, the identity of the florist foil converters who *alone* serve these

florist purchasers is clearly limited to eight firms including Arrow, with some minor and as yet undefined competition from a few foreign firms indicated by the record. It is noteworthy that not only the number of firms thus serving the florists has remained fairly constant but up through the 1956 acquisition, now under review, the same individual firms comprised this number.

Secondly, both producer and consumer recognition of the florist foil submarket as a definite economic entity is clearly demonstrated by what appears to have been the election of other decorative foil converters not to serve the florist industry, by the habit and practice of the extensive florist industry itself in purchasing only from florist foil converters like Arrow and not from other decorative foil converters, and again, by the failure of decorative foil users other than florists to purchase the lower priced florist foil.

Pricing forms the final point. Substantial evidence discloses a markedly lower price for florist foil compared with the price of other colored or embossed aluminum foil sold in comparable weight units and gauged at approximately the same thickness. We think price differentials have an important if not decisive bearing in the quest to delimit a submarket. No prudent businessman (the ordinary end user of foil), would purchase colored or embossed foil at prices on this record of $1.15 to $1.22 per unit when another foil converter market offers florist foil, similarly colored or embossed, and of similar gauge and weight, at a cost of only $.75 to $.85 per unit. The fact that prudent businessmen do so supports the inference, drawn in the negative since as we have noted the record lacks affirmative evidence on the point, that florist foil must be distinct and separable from aluminum foil generally or the many users of the latter would have long ago begun to substitute the former at the lower price. Such a difference in price as appears on this record must effectively preclude comparison, and inclusion in the same market, of products as between which the difference

exists, at least for purposes of inquiry under Sec. 7 of the Clayton Act.

It appears, therefore, that the florist foil market probably is a distinguishable product market, and therefore the production and sale of decorative aluminum foil to the florist trade is a "line of commerce" within the meaning of Sec. 7. See International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); Crown Zellerbach Corp. v. F. T. C., 296 F.2d 800 (9th Cir. 1961).

The effect of the acquisition of Arrow on this line of commerce was therefore justifiably predicted as substantially anti-competitive. While as many as eight or more firms converted foil for the florist industry, we have observed that roughly 33% of this business had been captured by Arrow alone prior to the 1956 transaction tying Arrow into Reynolds. When Arrow was vertically integrated through the Reynolds' acquisition, one minor anti-competitive effect foreseeable was the exclusion of other manufacturers of raw foil (Reynolds' competitors) from selling to approximately 33% of the florist foil converting industry. However, neither the examiner nor the Commission rested their conclusions that Sec. 7 had been violated on this basis, nor should we. The truer picture of anti-competitive effect emerges from even the most cursory consideration of the post-acquisition competitive postures of the eight previously independent florist foil converters vis a vis one another. Arrow's assimilation into Reynolds' enormous capital structure and resources gave Arrow an immediate advantage over its competitors who were contending for a share of the market for florist foil. The power of the "deep pocket" or "rich parent" for one of the florist foil suppliers in a competitive group where previously no company was very large and all were relatively small opened the possibility and power to sell at prices approximating cost or below and thus to undercut and ravage the less af-

fluent competition. The Commission is not required to establish that the Reynolds' acquisition of Arrow did in fact have anti-competitive consequences. It is sufficient if the Commission shows the acquisition had the capacity or potentiality to lessen competition. That such a potential emerged from the combination of Reynolds and Arrow was enough to bring it within Sec. 7.[6] But the Commission on substantial evidence has additionally provided us with a finding of *actual* anti-competitive effect, where as an apparent consequence of retroactive price reductions for Arrow foil after the acquisition of florist foil sales of 5 of Arrow's 7 competitors had by 1957 dropped from 14% to 47% below 1955 sales. Arrow's sales over the same period increased by 18.9%.

The necessary probability of anti-competitive effect has thus been shown. In agreeing with the Commission, however, we do not, nor could we intimate, that the mere intrusion of "bigness" into a competitive economic community otherwise populated by commercial "pygmies" will *per se* invoke the Clayton Act. See Brown Shoe, 370 U.S. at 328–329, 82 S.Ct. at 1525–1526. Each factual situation under judicial review has its own atmosphere of economic freedom and viability or lack thereof; occasion may well arise where an acquisition superficially similar to the one here condemned by the Commission may be encouraged as necessary to *preserve* competition, to maintain production levels adequate to meet consumer demand or otherwise to produce "countervailing competitive, economic or social advantages." Id. at 334,

82 S.Ct. at 1529. No comment on these possibilities is required here beyond observing that we now rule on the unique problems presented by this record relating to the florist foil converting industry in light of the controlling authorities.

Reynolds' final contention is that the Commission's order of divestiture of January 21, 1960, should be modified to delete the provisions respecting Reynolds' plant in Torrance, California. At the time of acquisition, Arrow did not own a building, but instead carried on business in leased space. Subsequent to acquisition *Reynolds* (not Arrow) *constructed* a $500,000 plant in Torrance into which Arrow moved all its physical assets and commenced operations in 1958. The Commission's order requires that Reynolds divest itself of all its interest in Arrow, including "the new plant built after the acquisition for Arrow Brands, Inc., and so much of any other assets and properties put into the business of Arrow Brands, Inc., since the acquisition *as may be necessary to restore it*" to its former competitive standing in the florist foil industry. (Emphasis added.)

Reynolds' position is that the Commission is without authority to require divestiture of assets not obtained by the acquisition. We think that is correct, without reaching the supporting argument that such an order to divest, if implemented, would offend the due process clause of the Fifth Amendment to the Constitution.

The Commission's response to Reynolds' request to modify was that the order did not necessarily require divestiture of the Torrance plant and other

---

6. "A requirement of certainty and actuality of inquiry to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." S.Rep. No. 1775, 81st Cong., 2d Sess. 6. "Congress was desirous of preventing the formation of further oligopolies with their attendant adverse effects upon local control of industry and upon small business. Where an industry was composed of numerous independent units, Congress appeared anxious to preserve this structure." Brown Shoe

Co. v. United States, 370 U.S. 294, 333, 82 S.Ct. 1502, 1528, 8 L.Ed.2d 510 (1962).

"Imminent monopoly may appear when one large firm acquires another, but it is unlikely to be perceived on a small acquisition by a large enterprise. As a large concern grows through a series of such small acquisitions, its accretions of power are individually so minute as to make it difficult to use the Sherman Act tests against them." S.Rep. No. 1775, 81st Cong., 2d Sess. 8.

after-acquired property if an alternative method of restoring Arrow's former independent competitive standing could be found. We note that title to the Torrance plant is in Reynolds, and that Reynolds' money raised the structure. Certain equipment placed in the plant was similarly purchased by Reynolds after acquisition, the title to which is also in Reynolds. However, the equipment and other assets of Arrow which were acquired *at the time Reynolds purchased Arrow* are separable from the after-acquired Reynolds' equipment in the Torrance plant, and could apparently be divested without disturbance to the remaining properties. Consequently, while we foresee an unavoidable dilution of the effect of the Commission's action against Reynolds for the Section 7 violation, we see no basis for ordering divestiture of the after-acquired properties. The focus of both the Commission's and this court's scrutiny of this case has been on the acquisition of Arrow *in 1956.* That date marks the violation and on this record delimits the properties to be affected by government decree. After-acquired properties are not relevant, except in the case where they represent reinvestment of capital realized from the sale of property included in a forbidden acquisition and replacement of that property. Divestiture is an extremely harsh remedy, see Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), and should be decreed as to property obtained by such an acquisition only when necessary to the restoration of the competitive situation altered by the acquisition. See United States v. National Lead Co., 332 U.S. 319, 351–352, 67 S.Ct. 1634, 1649, 1650, 91 L.Ed. 2077 (1947). If ever *after-acquired* property may be subject to a government order to sell, an even greater necessity, totally absent on the present record, must be shown. Inasmuch as there is a failure on this record to demonstrate (1) any nexus between continued possession of after-acquired property, such as the Torrance plant, and the violation of

Section 7, and (2) that restoration of the competitive status quo compels divestiture of such property, that part of the Commission's order requiring divestiture of property built or acquired after the 1956 acquisition of Arrow cannot be sustained.

The order of the Commission will be modified as indicated and, as modified, affirmed and enforced. The Commission will submit a proposed enforcement decree consistent with this opinion and pursuant to Rule 38(*l*) of this court, 28 U.S.C.A.

Affirmed and order will be enforced.