UNITED STATES of America, Plaintiff,

v.

BLUE BELL, INC., and Genesco, Inc., Defendants.

Civ. A. No. 7004.

United States District Court, M. D. Tennessee, Nashville Division.

Feb. 19, 1975.

**540**

Charles H. Anderson, U. S. Atty., Nashville, Tenn., Charles Stark, James Winchester and Michael P. Harmonis, Anti-Trust Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Carmack Cochran, Nashville, Tenn., and Sullivan & Cromwell, New York City, for Blue Bell, Inc.

Ames Davis Nashville, Tenn., and Donovan, Leisure, Newton & Irvine, New York City, for Genesco, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORTON, District Judge.

### I. THE COMPLAINT

On April 25, 1973, the United States filed this civil action under Section 15 of the Act of Congress of October 15, 1914, as amended (15 U.S.C. Sec. 25), commonly known as the Clayton Act, to prevent and restrain the violation by defendant Blue Bell, Inc. of Section 7 of the Clayton Act (15 U.S.C. Sec. 18). The violation charged was Blue Bell's acquisition on or about July 21, 1972 of the assets of the Hayes Company Division of Genesco, Inc. Genesco was also made a defendant for purposes of relief. The Government contends in its complaint that the effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in interstate commerce in the manufacture and sale of industrial rental garments to unaffiliated industrial laundries.

### II. PARTIES

#### A. *Genesco, Inc.*

Genesco, Inc. (hereinafter "Genesco") is a corporation organized and existing under the laws of Tennessee with its main office in Nashville, Tennessee. It is an international manufacturer and retailer of apparel and footwear, with sales for the fiscal year ending July 31, 1972, of approximately $1,395 million.

In early 1971, Genesco merged two subsidiaries, Hayes Garment Co. and J. M. Wood Co., and continued their operations as the "Haywood" Division. As part of the Haywood operations, Genesco continued to operate the Hayes Company Division (hereinafter "Hayes"), which was a sales division of Haywood engaged primarily in the sale of work clothing and executive shirts and slacks to rental laundries. Genesco also continued to use former Hayes Garment Co. plants to make the work clothes sold by the Hayes Company, including two plants in Elkton and Tompkinsville, Ky. Work shirts and jackets sold by the Hayes Co. were made in the Elkton Plant and work pants at the Tompkinsville plant.

In its last full year of operation prior to the acquisition, Hayes had total sales of approximately ·$11 million, of which about $7.9 million were sales of work

shirts, work pants and work jackets, the remainder consisting primarily of dress shirts and slacks.

At the time of the acquisition Hayes had five warehouses serving as distribution points for delivery of its garments to rental laundries. The warehouses were located at Nashville, Tennessee; Hillside, New Jersey; San Leandro and Santa Fe Springs, California; and Houston, Texas.

### B. *Blue Bell, Inc.*

Blue Bell, Inc. (hereinafter "Blue Bell") is a Delaware corporation with its main office in Greensboro, North Carolina. It manufactures men's, women's and children's clothing, with 1972 sales of approximately $334 million.

Blue Bell's Red Kap Industries Division (hereinafter "Red Kap"), which is headquartered in Nashville, manufactures and sells a line of industrial uniforms sold primarily to rental laundries. Red Kap is among the largest United States manufacturers of work clothes and uniforms for rental laundries, with 1971 sales to rental laundries of about $26.1 million, of which approximately $24.3 million were sales of work shirts, work pants, work jackets, coveralls and shop coats, with the remainder consisting primarily of dress shirts and slacks.

At the time of the acquisition, Red Kap had four manufacturing plants, and maintained six warehouses for the distribution of its products. The warehouses were located in Nashville, Tennessee; Detroit, Michigan; Montebello, California; Rahway, New Jersey; Atlanta, Georgia; and Dallas, Texas.

Blue Bell and Genesco are and at all times relevant to this action have been, engaged in interstate commerce.

### III. THE ACQUISITION

On July 21, 1972, Blue Bell acquired from Genesco substantially all of the assets used by Genesco in the operation of its industrial laundry business, i. e., the business of manufacturing and selling garments for rental laundries. The as-

sets included the leases to the Elkton and Tompkinsville garment manufacturing plants, equipment, inventories of garments and piece goods, the accounts receivable, leases to the Hayes Company warehouses, and Hayes trademarks, tradenames, and logos, and other assets used by Genesco in connection with its industrial laundry business, the assets being sufficient to operate a going concern.

### IV. GEOGRAPHIC MARKET

The relevant geographic market in which to measure the effect on competition of this acquisition (the "section of the country") is the nation.

### V. THE LINE OF COMMERCE

#### A. *The Applicable Law*

In Brown Shoe Company v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court set forth indicia by which courts may determine what constitutes a product market under Section 7:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593–595 [77 S.Ct. 872, 877, 1 L.Ed.2d 1057] . . . . The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

Product markets do not have to meet all of these indicia in order to be a line of commerce under Section 7. What

542

must ultimately be determined is whether the product market is meaningful in terms of trade realities and forms an area of effective competition. Crown Zellerbach Corp. v. F. T. C., 296 F.2d 800, 811 (9th Cir. 1961), cert. den. 320 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962); United States v. Pennzoil Co., 252 F.Supp. 962, 974 (W.D.Pa.1965). For example, in United States v. Aluminum Co. of America (Rome Cable), 377 U.S. 271, 276, 277, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), the Supreme Court found aluminum conductor to be a product market on the basis of certain distinctive end uses and distinct prices. In Reynolds Metals Co. v. F. T. C., 114 U.S.App.D.C. 2, 309 F.2d 223, 227 (1962), in an opinion by now Chief Justice Burger, the Court of Appeals sustained a finding that florists' foil was a line of commerce distinct from all other varieties of aluminum foil solely on the basis of (1) industry recognition, (2) distinct customers and (3) distinct prices. And in United Nuclear Corp. v. Combustion Engineering, 302 F.Supp. 539 (E.D.Pa. 1969), the court found that fabricated nuclear fuel "obviously" formed a line of commerce, solely on the basis that "[nuclear steam supply system] units utilize only this kind of fuel." Id. at 552.

█ A line of commerce does not have to be confined to a single product or service. For instance, commercial banking, which is a cluster of different but related services, is a line of commerce distinct from all other credit and financial services because some of its services are so distinct as to be free from effective competition, others enjoy cost advantages and still others enjoy settled consumer preferences. United States v. Philadelphia National Bank, 374 U.S. 321, 356–357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

█ Nor is it necessary that a line of commerce be insulated from competition from other products or services. In United States v. Grinnell Corp., 384 U.S. 563, 574, 86 S.Ct. 1698, 1706, 16 L.Ed.2d

778 (1966), the Supreme Court held that central station protective services were a distinct market, even though they faced competition from other types of alarm or watchmen services.

What defendants overlook is that the high degree of differentiation between central station protection and the other forms means that for many customers, only central station protection will do. Though some customers may be willing to accept higher insurance rates in favor of cheaper forms of protection, others will not be willing or able to risk serious interruption to their businesses, even though covered by insurance, and will thus be unwilling to consider anything but central station protection.

Id., 384 U.S. at 574, 86 S.Ct. at 1706. The Court further held that accredited, as opposed to nonaccredited service, was a relevant market, finding that "there is indeed evidence that customers consider the unaccredited service as inferior." Id., 384 U.S. at 575, 86 S.Ct. at 1706. (Although Grinnell was decided under § 2 of the Sherman Act, the Court made it clear that its markets would also have been a market under Section 7 of the Clayton Act. Id., 384 U.S. at 573, 86 S.Ct. 1698.)

█ In this case, the Government contends that the court should focus on a market consisting of sales of industrial rental garments to unaffiliated rental laundries, and which does not include sales of such garments to other purchasers. This approach is consistent with the general principle applied in all Section 7 cases, that the court must focus on the "effective area of competition" between the acquired and acquiring firms. United States v. DuPont (GM), 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057. Where an identifiable class of purchasers of a product has particular requirements for the product involved which differentiate that class from other purchasers of the product, it follows that an acquisition involving suppliers of that product will have a unique im-

pact on that class of purchasers. Accordingly, their requirements for the product may delineate a market under Section 7. This approach was adopted by the District Court in United States v. General Dynamics, 341 F.Supp. 534, 557 (N.D.Ill.1972), aff'd on other grounds, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). In *General Dynamics*, the District Court found "two unique coal customers for purposes of market delineation," on the basis, in part, of particular air pollution standards which affected their choice of energy sources. *Id.,* at 557. See also United States v. Du-Pont & Co., 353 U.S. 586, 594, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), in which the Supreme Court held that the relevant market for automotive finishes and fabrics was coextensive with the automobile industry, although the District Court had found only that duPont's automotive finishes were used *principally* as a topcoat on automobiles. United States v. duPont & Co., 126 F.Supp. 235, 295 (N.D.Ill.1954), rev'd on other grounds, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

■■ A number of industrial rental garment manufacturers own, are owned by, or are under common ownership with rental laundries. The Government contends, and the Court agrees, that these manufacturers' sales of industrial rental garments to their own affiliated laundries are not within the market in respect to which the competitive effects of this acquisition should be judged. The purpose of establishing a relevant market in a Section 7 case is to delineate an area in which the acquiring and acquired companies competed, as a basis for determining the acquisition's effect on competition in that area. Not surprisingly, where rental garment manufacturers and laundries are under common ownership, the laundries buy the bulk of their requirements from their affiliated manufacturer, and other manufacturers are effectively foreclosed from competing for that business. Accordingly, it is not part of the market in

which there was effective competition among manufacturers.

■ It is a well established principle of antitrust law that vertical foreclosure of this nature may occur when firms that have a supplier-customer relationship come under common ownership. As the Supreme Court noted in *Brown Shoe,* "Every extended vertical arrangement by its very nature, for at least a time, denies to competitors of the supplier the opportunity to compete for part or all of the trade of the customer-party to the vertical arrangement." Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523 (1962). See International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp., 351 F.Supp. 1153, 1176–1177 (D.Hawaii 1972) (on appeal).

B. *Findings of Fact*

Rental laundries are firms that contract with business establishments to provide clean garments for employees' use and, in some cases, other textile products including towels, rags and linens. The garments are purchased and owned by the laundries, which periodically pick up soiled goods from their customers' establishments and replace them with clean ones.

Rental laundries traditionally have been classified as "industrial" or "linen supply," the distinction being based on the types of customers served. Industrial laundries generally serve manufacturing and industrial plants, service stations, automobile dealerships, service industries and the like. Linen suppliers, on the other hand, serve such businesses as hotels, motels, restaurants, barber shops, beauty shops, bakeries and dairies.

Although many industrial and linen supply laundries have expanded their markets to serve both industrial and linen supply accounts, there remains a well-recognized distinction between the types of garments considered as industrial, on the one hand, and as linen supply, on the other. Industrial gar-

ments of the type handled by rental laundries include work shirts, work pants, work jackets, coveralls and shop coats. Linen supply garments commonly include medical uniforms worn by doctors, nurses and orderlies, smocks, laboratory coats, bartenders' jackets, barbers' coats and waiters' and waitresses' uniforms.

In addition to industrial garments and linen supply apparel, some rental laundries also furnish executive or career apparel, which include dress shirts, dress slacks, blazers and tailored garments.

A number of manufacturers of industrial rental garments own, are owned by, or are commonly owned with rental laundries. These "affiliated" rental laundries purchase the bulk of their industrial rental garment requirements from the manufacturers with which they are affiliated, and generally purchase from other manufacturers only when their affiliated manufacturers do not make the garments they require, do not have them in stock or cannot deliver them promptly. Other manufacturers are thus effectively foreclosed from competing to fill those portions of affiliated laundries' requirements that can be met by the laundries' affiliated manufacturers.

1. *There is Industry Recognition That the Manufacture and Sale of Industrial Rental Garments is Separate Economic Entity*

There is widespread industry recognition that the manufacture and sale of industrial rental garments is a distinct line of business. This recognition is reflected in documents and advertising materials prepared by the defendants, and in comments made by officials of Genesco's Haywood Division and Blue Bell's Red Kap Division.

Officials of other work clothing manufacturers testified that the sale of work clothing to the rental industry is a distinct line of business.

Another indication of the industry's recognition of the business of manufacturing and selling work clothes to rental laundries as a distinct economic entity is the fact that different firms are viewed as competitors in that field than in the field of manufacturing and selling retail work clothing.

2. *Industrial Rental Garments Have Peculiar Characteristics and Uses*

Industrial Rental Garments are constructed differently from retail work clothing because industrial rental garments and retail work garments are intended to be processed and utilized differently during their respective lives. The retail work clothing purchaser does not analyze garment life and durability, nor is the garment exposed to the rigors of industrial laundering with its high temperature and abuse. The rental laundry industry demands materials and construction which will last in service for 1–2 years with minimum repairs.

In order to meet the rental industry's special requirements for durable garments, the Institute of Industrial Launderers has promulgated rental garment fabric standards, and mills have developed fabrics and finishes particularly suited for use in rental garments.

Fabrics for use in industrial rental garments are required to meet more stringent standards of shrinkage-resistance and color fastness.

Fabrics used in industrial rental garments often use finishes peculiar to the laundry trade, such as Vapor Phase and industrial Visa.

Rental laundries also require that their various suppliers provide garments that are basically similar in appearance in order to simplify their inventories and provide their customers with uniform-looking garments.

Manufacturers of industrial rental garments have incorporated construction and appearance features in their gar-

ments, in response to the rental industry's practical and customary requirements, which distinguish these garments from other types of work clothing.

The following features generally distinguish work shirts made for the rental laundry industry from retail work shirts:

| *Rental* | *Retail* |
|---|---|
| Plain (poplin) or leno weave fabric | Various weaves, including twill, chambray, poplin, leno |
| Lighter weight fabric | Heavier fabric |
| Convertible one-piece collar | Banded collar |
| No top stitching on collar | Top stitched collar |
| Snap neck closure, generally snap cuff closures | Button neck and cuff closures |
| No pocket flaps | Generally have pocket flaps |
| Color-coded permanent laundry label | Retail label |
| Pencil stall in pocket | No pencil stall |
| No back pleat | May or may not have back pleat |
| One-piece, squared cuffs | Most have two-piece, rounded cuffs |
| Sized S, M, L, etc. | Sized in inches |

The following features generally distinguish work pants made for the rental laundry industry from retail work pants:

| *Rental* | *Retail* |
|---|---|
| 2 x 1 twill weave | Most use 3 x 1 twill weave |
| Dark pocketing and lining | Light colored pocketing and lining |
| Unfinished or hemmed bottoms | Hemmed or cuffed bottoms |
| Most have fly lining | No fly lining |
| Usually not topstitched on pocket front | Frequently topstitched pocket front |
| May or may not have waistband innerlining | Waistband innerlining |
| Usually no dart at hip pocket | Dart at hip pocket |
| Usually use Gardlok zipper | Various zippers |
| Extra bartacking at stress areas | |

The following features generally differentiate coveralls made for sale to rental laundries from those made for retail sale:

| *Rental* | *Retail* |
|---|---|
| Plain back | Bi-swing back |
| No elastic in waist | Elastic in waist |
| No hammer loops | Hammer loops |
| No flap pockets | Pocket flap |

Work jackets made for the rental industry generally conform to a standard, waist-length (Eisenhower) style, with quilted nylon lining and banded bottom, while jackets made for the retail market vary extensively in design and construction.

### 3. *Industrial Rental Garments Have Distinct Customers*

The principal purchasers of industrial rental garments are rental laundries.

### 4. *Industrial Rental Garments Have Distinct Prices*

Industrial rental garments are priced distinctly from other types of work clothing, including retail work clothing and work clothing sold directly to industry.

### 5. *Industrial Rental Garments are Manufactured and Sold by Specialized Vendors*

Because of the specialized nature of industrial rental garments and the peculiar needs of rental laundry customers, garment manufacturers who make and sell industrial rental garments tend to either specialize in the production and sale of these garments or have corporate divisions which do.

There are a number of important differences between the marketing of work clothing to the rental laundry trade and to the retail market. The first significant difference is in delivery by a manufacturer of the garments to his customer. The rental laundry business is a service industry, and rapid delivery of the garments is of great significance to the laundry customers. This requirement has led industrial rental garment manufacturers to maintain regional warehouses with extensive inventory for prompt service in various geographic areas, and some laundries choose suppliers on the basis of their nearby garment distribution centers in order to assure rapid delivery capability. Manufacturers without such warehouses are at a competitive disadvantage.

Retail customers plan their purchases on a more advanced basis, and as a result orders are placed and delivered over a period of several weeks, reducing the need for regional distribution points.

There is general recognition among companies in the rental and retail trade that separate sales forces are needed in selling work clothes to retail outlets and industrial rental garments to rental laundries, because the salesmen dealing with rental laundries must be conversant with the laundry business and the interest of laundries in long garment life and an absence of repairs.

The retail trade orders large quantities of garments in a single color; rental laundries often buy smaller amounts to service particular customers or for fill-ins.

Serving retail accounts merely requires being able to supply garments; rental laundry customers require a manufacturer to be able to fill orders quickly for all sizes needed and to be able to fill all of the order.

Credit to rental laundries is different because credit information on the laundries is not available from the usual sources, and some rental laundries are slow to pay their bills.

The retail work clothes market is oriented towards appealing to the retail consumer in the store, with attractive garment packaging, pricing to conform to retail price points with a suitable mark-up, and detailing, styling, and colors comparable to those offered by retail competitors. For rental laundry customers, point of sale materials and packaging found on retail-style garments is merely an inconvenience.

### 6. *Work Clothes Sold Directly to Industry Are Not Within the Line of Commerce*

Some work clothing manufacturers make garments for sale directly to industrial concerns for the use of their employees. Often these garments are designed to conform to a national firm's "corporate identity" program, such as

those of various oil companies or automobile companies. These garments may differ substantially in appearance and construction from the types of garments normally sold to rental laundries, and are not interchangeable with conventional industrial rental garments.

Even where "direct sale" garments do not incorporate a national firm's peculiar colors, stripes, logos or other identifying features, the garments commonly differ from the type of work clothing normally purchased by rental laundries in construction, appearance and price, having more in common with retail-type work clothing.

The marketing of work clothes directly to industry, on the one hand, and of rental garments to laundries, on the other, imposes sufficiently different requirements that some companies seeking to operate in both markets have established separate sales forces, separate profit centers and realized different profit levels for the two lines.

### 7. *Linen Supply Garments are not Within the Line of Commerce*

Industrial rental garments and linen supply garments are distinct and non-competitive lines of products, although both are sold to rental laundries. The garment and rental laundry industries recognize the distinction between industrial and linen garments.

Linen garments are customarily washed, while industrial rental garments are both dry cleaned and washed.

Linen and industrial garments are made on separate production lines.

For the most part, different companies dominate in the manufacture of industrial and linen supply garments. Leading linen suppliers include M. Snower, Angelica, American, Fashion Seal, and Best, among which only American is a major factor in the industrial rental garment field.

Jobbers are commonly used in the distribution of linen supply garments, but not for industrial rental garments.

### 8. *Executive Wear is Not Within the Line of Commerce*

Similarly, executive wear, or career apparel, constitutes a line of garments distinct from the laundry-type work clothes referred to as industrial rental garments. Executive wear primarily includes dress shirts and slacks which are rented by laundries to be worn by their customers' "front office," or white collar personnel.

Executive slacks are dressier in appearance and are made of fabrics other than those used in conventional 65/35 polyester/cotton twill laundry work pants. Executive shirts are made of broadcloth weave fabric, have top-stitched, banded collars, button closures, are made in colors not generally found in work clothes and are generally dressier in appearance.

A number of major industrial rental garment manufacturers do not make executive wear, while those that do classify it as a distinct line from their industrial garments.

While some industrial laundries accept some retail clothes in emergencies, because of non-availability of industrial garments or for other reasons, there is no proof that the retail trade will accept industrial rental garments with their peculiar stripped down appearance.

## VI. LESSENING OF COMPETITION

### A. *The Applicable Law*

█ The primary index of the probable anticompetitive effect of an acquisition is the market power of the firms involved. It is common in Section 7 cases to look at the companies' market shares as the primary measure of their market power, and hence of the effect the firms' combination is likely to have on competition. As the Supreme Court recognizes, "[C]ompanies that have controlled sufficiently large shares of a concentrated market are barred from merger by § 7 . . . because their past performances imply an ability to continue to dominate with at least equal vig-

or." United States v. General Dynamics Corp., 415 U.S. 486, 501, 94 S.Ct. 1186, 1195, 39 L.Ed.2d 530 (1974). Thus, the Court has held that an acquisition involving firms with a combined market share of 30% is presumptively unlawful, on the ground that

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

United States v. Philadelphia National Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963). In striking down a merger that resulted in a 35% market share, the Court held that

> . . . where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with
>
> . . .

United States v. Continental Can Company, 378 U.S. 441, 458, 84 S.Ct. 1738, 1748, 12 L.Ed.2d 953 (1964). Subsequently the Court held illegal under Section 7 a merger involving a combined market share of 7.5%. United States v. Vons' Grocery Company, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966). See also, United States v. Aluminum Co. of America, 377 U.S. 271, 278, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) (combined shares in the two relevant markets of 29.1% and 15.3%, with the top five firms in each market having combined shares, before the acquisition, of 76% and 65.4%); United States v. Pabst Brewing Co., 384 U.S. 546, 551–552, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (combined shares in three relevant markets of 4.49%, 11.32% and 23.95%). See also The Stanley Works v. F.T.C., 469 F.2d 498, 501, 504 (2d Cir. 1972), cert. den. 412 U.S. 928, 93 S.Ct. 2750, 37 L. Ed.2d 155 (1973) (companies had pre-ac-

quisition shares in the relevant market of 22–24% and 1%; market already concentrated with four largest firms having 49–51% of the market).

■ The extent to which a market is already concentrated, and to which an acquisition increases the degree of concentration, is an important indication of anticompetitive effect of the acquisition. As the Supreme Court has noted,

> [I]f concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great.

United States v. Philadelphia National Bank, *supra,* 374 U.S. at 365, n. 42, 83 S.Ct. at 1742.

■ It is not necessary to rely on numerical market share data, however, to conclude that an acquisition is anticompetitive. For, as the Supreme Court held in United States v. First National Bank and Trust Company of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964);

> Where, as here, the merging companies are major competitive factors in a relevant market, the elimination of significant competition between them constitutes a violation of § 1 of the Sherman Act.

*Id.,* 376 U.S. at 672–673, 84 S.Ct. at 1037. An acquisition that constitutes an unreasonable restraint of trade under the more rigorous standards of Section 1 of the Sherman Act *a fortiori* gives rise to a reasonable probability of a substantial lessening of competition in violation of Section 7 of the Clayton Act. United States v. Manufacturers Hanover Trust Company, 240 F.Supp. 867, 955 (S.D.N. Y.1965).

In the *Manufacturers Hanover Trust Company* case, both parties had offered extensive statistical evidence in support of their arguments. The Court found both parties' market share statistics unreliable, but found on the basis of other evidence in the record that the merging

banks were vigorous, substantial and major factors in competition generally (*Id.* at 951) and that the elimination of competition between them violated the Clayton Act.

### B. *Findings of Fact*

Red Kap is and, at the time of the acquisition was, the largest firm in terms of industrial rental garment sales to unaffiliated laundries, and one of the two largest firms if sales to all rental laundries are taken into account.

Red Kap was considered by its competitors as one of, if not the, leading competitor in the manufacture and sale of industrial rental garments to the rental industry, and Hayes was considered as among the leading competitors.

Prior to Red Kap's acquisition of the Hayes assets, Red Kap was Hayes' most significant competitor.

Hayes and Red Kap each had distribution centers located across the United States, giving them a significant advantage in competing with firms having less extensive warehouse networks.

In 1971, the year before the acquisition, Red Kap accounted for 23% and Hayes 7.5% of all industrial rental garment sales to unaffiliated laundries. Prior to the acquisition, 44.7% of all industrial rental garment sales to unaffiliated laundries were accounted for by the two largest firms in the market, 69.7% by the four largest and 80.9% by the eight largest.

There are significant barriers to the entry of new firms into the market. These barriers include the need for expertise in the particular requirements of the rental industry, capital requirements for the building of substantial inventories and establishment of distribution centers, the cost of having to carry laundry accounts for extended periods, rental laundries' tendency to remain with established suppliers, and the prospect of a lower rate of return than can be earned in other segments of the apparel industry.

As a result of the acquisition, the Hayes Company was eliminated as a substantial competitor in the manufacture and sale of industrial rental garments.

As a further result of the acquisition, concentration in the manufacture and sale of industrial rental garments has been increased.

The sale of industrial rental garments to unaffiliated rental laundries is an appropriate line of commerce in which to view the competitive effects of the acquisition (see supra, Findings 12–42). It is a recognized submarket in the work clothes segment of the apparel industry.[1] If one were to determine that the submarket should consist of industrial rental garments to all rental laundries, as distinguished from unaffiliated rental laundries, the court would reach the same conclusion based on the survey evidence.[2]

The sale of industrial rental garments to rental laundries, either unaffiliated or both affiliated and unaffiliated, constitutes a highly concentrated market. The larger competitors' prices influence the market. Entry into the market would be substantially affected by the pricing attitude of Blue Bell, Inc. Certainly as a result of the acquisition, there has been further concentration in the manufacture and sale of industrial rental garments. Viewing the merger realistically and functionally, the inescapable conclusion is that it probably will substantially lessen competition.

1. No opinion is expressed as to whether the sale of linen supply garments as specialized work uniforms to industrial laundries may be a distinct submarket.

2. Attached hereto as Appendix A & B are tables showing the standing and relative shares of the market of the competitors in the sales to unaffiliated laundries and to both affiliated and unaffiliated laundries.

**550**

### VII. DEFENDANT BLUE BELL'S CONTENTIONS

The defendant asserts that:

(a) the product market must include all work clothes;

(b) in any event Genesco planned to sell its industrial laundry division;

(c) Genesco's industrial laundry division had been unprofitable;

(d) Washington Industries entered the field after the acquisition and that competition was not lessened.

■ Blue Bell asserts that the product market or line of commerce must include more than industrial rental garments and should be other work clothes, including retail work clothes, linen supply garments, executive wear, and work clothes sold directly to industrial concerns. The Court rejects this contention (see Findings of Fact *supra*). The realities of the situation are such that the market urged by the Government defines an area of effective competition. See Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L. Ed.2d 314 (1964), FTC v. Procter and Gamble, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), United States v. Kennecott Copper Corp., 231 F.Supp. 95 (S.D.N.Y.1964), aff'd 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965), United States v. Tidewater Marine Service, Inc., 284 F.Supp. 324 (E.D.La.1968). United States v. Kimberly-Clark Corp., 264 F.Supp. 439 (N.D.Calif.1967). Reynolds Metals Co. v. FTC, 114 U.S. App.D.C. 2, 309 F.2d 223 (1962). General Foods Corp. v. FTC, 386 F.2d 936 (3rd Cir. 1967), cert. denied 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968). A. G. Spaulding & Brothers v. FTC, 301 F.2d 585 (3rd Cir. 1962).

■ The fact that Genesco intended to divest itself of its industrial laundry division is immaterial. The fact that the earnings of its laundry division were unsatisfactory does not put it within the definition of a "failing company" defense. Then this too is immaterial. See United States v. Phillips Petroleum Co., 367 F.Supp. 1226, 1260 (C.D.Cal.1973), aff'd 418 U.S. 906, 95 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

■ It is true that Washington Industries did enter the field after the transaction in question. It had, in fact, previously negotiated with Genesco to acquire a portion of the assets subsequently acquired by Blue Bell. However, the fact that as a possible entrant into the field it did so enter by acquiring certain of Genesco's personnel does not offset the result in this case. Due to a requirement in the agreement between Genesco and Blue Bell in effect requiring the firing of the personnel so vital to Washington, the key personnel of Genesco became available for hire. Washington Industries obtained their services. However, its entry into the market does not materially affect market conditions, and does not dilute the power of Blue Bell to influence the market; nor would this circumstance in any way facilitate the entry of other possible future entrants into the market.

In conclusion, it appears that the Government introduced evidence of such concentration that it established more than a *prima facie* case that the transaction in question would probably tend to substantially lessen competition. The defendant has not shown otherwise. United States v. Marine Bancorporation, 1974, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

### VIII. CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. This action is properly brought in the Middle District of Tennessee, Nashville Division.

3. The United States as a whole is the relevant section of the country in which to measure the effect of Blue Bell's acquisition of the assets of Genesco's industrial rental garment business.

4. The manufacture and sale to unaffiliated rental laundries of industrial rental garments is an appropriate line of commerce with respect to which the effect of the acquisition on competition may be measured.

5. Blue Bell's acquisition of the assets of Genesco's industrial rental garment business violated Section 7 of the Clayton Act because its effect may be substantially to lessen competition or to tend to create a monopoly in the manufacture and sale of industrial rental garments to rental laundries throughout the United States.

6. Plaintiff is entitled to a judgment ordering divestiture of the acquired assets under such terms and conditions as will insure the prompt restoration of the Hayes Company as a competitive entity.

TABLE A

SALES BY MANUFACTURERS OF INDUSTRIAL RENTAL GARMENTS TO UNAFFILIATED RENTAL LAUNDERERS, 1971, 1972, 1973

| COMPANIES (RANKED IN ORDER OF 1971 SALES) | 1971 SALES | PERCENT OF TOTAL | 1972 SALES | PERCENT OF TOTAL | RANK | 1973 SALES | PERCENT OF TOTAL | RANK | PERCENT OF CHANGE 1971-2 | PERCENT OF CHANGE 1972-3 | PERCENT OF CHANGE IN SALES 1971-3 [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RED KAP | | | | | | | | | | | |
| WORK WEAR CORP. | | | | | | | | | | | |
| EDWARD HYMAN CO. INC. | | | | | | | | | | | |
| SEESWG INC. | | | | | | | | | | | |
| HAYES [2] | | | | | | | | | | | |
| GARMENT CORP. OF AMERICA | | | | | | | | | | | |
| REED MANUFACTURING CO. | | | | | | | | | | | |
| H. SETON AND SONS, INC. | | | | | | | | | | | |
| PERFECT JACKET MFG. CO. | | | | | | | | | | | |
| CINASLOW MFG. CO. | | | | | | | | | | | |
| UNITOG MANUFACTURING CO. INC. | | | | | | | | | | | |
| AMERICAN UNIFORM CO. | | | | | | | | | | | |
| PACKER UNIFORM MFG. CO. | | | | | | | | | | | |
| UNIVERSAL OVERALL CO. | | | | | | | | | | | |
| H.D. LEE COMPANY | | | | | | | | | | | |
| DELUXE MFG. CO. | | | | | | | | | | | |
| RENTEX SERVICE CORP. [3] | | | | | | | | | | | |
| E.W. BLYSS INC. | | | | | | | | | | | |
| CADILLAC OVERALL CO. | | | | | | | | | | | |
| AMBASSADOR UNIFORM CO. | | | | | | | | | | | |
| UNITED UNIFORM MFG. CO. | | | | | | | | | | | |
| HORACE SMALL MFG. CO. | | | | | | | | | | | |
| UNITOG CO. | | | | | | | | | | | |
| PEERLESS UNIFORM MFG. CO. | | | | | | | | | | | |
| SUNSET UNIFORM CO. | | | | | | | | | | | |
| KUH LAYSON-DICKIE MFG. CO. | | | | | | | | | | | |
| EXCELLO GARMENT CO. | | | | | | | | | | | |
| CHANEY UNIFORM CO. | | | | | | | | | | | |
| AUGUSTA CORP. | | | | | | | | | | | |
| WASHINGTON INDUSTRIES INC. [4] | | | | | | | | | | | |
| TOTALS | | | | | | | | | | | |

Notes:

1/ Parentheses denote a decrease in sales.

2/ Hayes was acquired by Blue Bell in July, 1971.

3/ Rentex did not manufacture garments after 1971.

4/ Washington did not manufacture industrial rental garments in 1971.

SOURCE: GX 143

TABLE B

## SALES BY MANUFACTURERS OF INDUSTRIAL RENTAL GARMENTS TO UNAFFILIATED AND AFFILIATED RENTAL LAUNDRIES, 1971, 1972, 1973

| COMPANIES (RANKED IN ORDER OF 1971 SALES) | 1971 SALES | PERCENT OF TOTAL | 1972 SALES | PERCENT OF TOTAL | RANK | 1973 SALES | PERCENT OF SALES | RANK | PERCENT OR CHANGE IN SALES 1971-2 | 1972-3 | 1971-3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Work Wear Corp. | $39,441,000 | .06 | $44,447,000 | .044 | 1 | $59,244,000 | .59 | 1 | 12 | 10 | 34 |
| Red Kap | 14,240,569 | .11 | 17,702,593 | .023 | 2 | 33,400,013 | .33 | 2 | 25 | 9 | 37 |
| Servisco | 14,337,149 | .11 | 14,304,895,660 | .018 | 3 | 15,219,265 | .1506 | 4 | 4 | 6 | 6 |
| Edward Hyman Co. Inc. | 11,455,545 | .09 | 14,039,009,844 | .016 | 4 | 12,151,005 | .177 | 5 | (14) | (17) | 6 |
| Hayes 3/ | 7,877,396 | | 6,051,31,453,483 | .257 | 13 | — | — | — | (52) | (100) | (100) |
| American Uniform Co. | 6,650,615 | .05 | 5,436,491 | .422 | 6 | 6,449,595 | .4130 | 6 | 53 | 5 | 23 |
| Samson Corp of America | 6,560,660 | | 6,534,214 | .367 | 8 | 6,673,256 | .4438 | | 117 | 35 | 44 |
| Best Manufacturing Co. | 3,744,039 | | 6,781,983,113 | .247 | 7 | 4,752,150 | .303 | 7 | 49 | 21 | 28 |
| M. Setlow and Sons Inc. | 3,714,460 | | 4,683,052 | .322 | 9 | 5,015,000 | .303 | 3 | 24 | 7 | 57 |
| Perfect Jacket Mfg. Co. | 3,407,621 | | 4,406,055 | .274 | 10 | 4,648,915 | .363 | 9 | 17 | 17 | 37 |
| Clayton Mfg. Co. Inc. | 3,182,356 | | 3,024,384 | .240 | 11 | 4,044,555 | .242 | 10 | (3) | 35 | 27 |
| Riverside Mfg. Co. | 2,857,403 | | 3,563,569 | .147 | 12 | 3,757,942 | .187 | 14 | 22 | 7 | 40 |
| Pacific Uniform Mfg. Co. | 2,083,045 | | 2,013,492,1 | .147 | 15 | 2,918,619 | .152 | 11 | 2 | 45 | 17 |
| Williamson-Dickie Mfg. Co. | 2,052,924 | | 2,552,134,96 | .147 | 14 | 2,468,930 | .154 | 15 | 20 | (2) | 17 |
| Cadillac Overall Company | 1,901,557 | | 2,247,712 | .170 | 15 | 2,256,710 | .147 | 16 | 25 | (9) | 18 |
| Universal Overall Co | 1,750,012 | | 2,069,750 | .144 | 16 | 2,225,619 | .144 | 8 | 81 | 9 | 27 |
| H. D. Lee Company | 1,619,492 | | 1,633,104 | .125 | 17 | 124,876 | .040 | 13 | (5) | (53) | (55) |
| United Company | 1,626,620 | | 1,655,000 | .117 | 18 | 1,255,000 | .050 | 17 | 3 | (24) | (22) |
| United Uniform Mfg. Co. | 1,572,041 | | 1,784,530 | .121 | 19 | 1,319,531 | .127 | 12 | 11 | 8 | (20) |
| Rentex Service Corp 4/ | 1,097,478 | .078 | 0 | | | 0 | | | (100) | — | (100) |
| Orella Mfg. Co | 475,097 | .051 | 643,042 | .044 | 20 | 652,057 | .043 | 18 | (5) | 1 | — |
| K.W.E. Mfg. Co. | 417,112 | | 500,674 | .034 | 21 | 614,264 | .040 | 19 | 7 | 6 | 23 |
| Ambassador Uniform Co. | 344,597 | | 319,645 | .022 | 33 | 338,394 | .020 | 21 | (7) | 34 | 14 |
| Hamco Small Mfg. Co. | 281,639 | | 329,403 | .023 | 24 | 316,045 | .020 | 22 | 19 | 20 | 9 |
| Peerless Uniform Mfg. Co. | 211,025 | | 272,144 | .017 | 22 | 303,312 | .019 | 23 | 23 | 12 | 37 |
| Sunset Undercos Co. | 160,010 | .014 | 0 | .011 | 1 | 0 | — | 24 | (100) | — | (100) |
| Euclid Garment Co. | 152,604 | | 153,544 | .012 | 25 | 211,257 | .014 | 25 | (100) | 14 | 35 |
| Angelica Corp | 159,405 | | 139,934 | .010 | 21 | 145,552 | .007 | 26 | 57 | 3 | 62 |
| Shane Uniform Co | 82,498 | | 96,434 | .007 | 25 | 116,164 | .007 | 27 | 69 | 20 | 47 |
| Washington Industries Inc 5/ | 57 | | (05,861) | .001 | 27 | 357,395 | .245 | 11 | .07 | 3576 | (1) |
| **Total** | $120,955,097 | 100.02% | $144,143,363 | 160.02 | | $148,450,452 | 100.00 | | .12 | .7 | 20 |

Source: GX 143

Notes:

1/ Parentheses denote a decrease in sales.
2/ Less than one half of one percent.
3/ Hayes was acquired by Blue Bell in July, 1972.
4/ Rentex did not manufacture garments after 1971.
5/ Washington did not manufacture industrial rental garments in 1971.